IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | Case No. 14-_____ |
| Thinkstream Incorporated of Delaware f/k/a Thinkstream, Incorporated of Colorado, | Chapter 11 (Involuntary) |
| *Alleged Debtor.* | Judge Douglas D. Dodd |

## AFFIDAVIT OF JOSE S. CASNSECO ON BEHALF OF TSB VENTURES, LLC PURSUANT TO BANKRUPTCY RULE 1003

**STATE OF LOUISIANA**
**PARISH OF EAST BATON ROUGE**

**BEFORE ME**, the undersigned authority, a Notary Public, duly commissioned, qualified and sworn, personally came and appeared:

### JOSE S. CANSECO,

who, after being duly sworn by me, did depose and say:

1.      I am a natural person of the full age of majority.

2.      I am of sound mind and have the capacity to make the statements contained herein.

3.      I am a resident of and domiciled in St. Tammany Parish, Louisiana.

4.      I am the manager and authorized representative of TSB Ventures, LLC ("TSB"), a petitioning creditor in the above-captioned involuntary bankruptcy case.

5.      I make the statement contained herein on behalf of TSB pursuant to FED. R. BANKR. P. 1003(a).

6.      On or about October 5, 2005, Thinkstream, Incorporated of Colorado duly authorized the issuance of certain 5% Debentures Due October 15, 2010 (CUISP 884100 AA 6) in the principal amount of $4,000,000.00 (the "Debenture" or "Debentures") to Commonwealth

Advisors, Inc. for itself and on behalf of its managed clients, CA High Yield Fund, Ltd., CA High Yield Fund, LLC, and CA Core Fixed Income Fund, LLC (collectively, the "Commonwealth Entities").

7.     On or about December 28, 2007, the Commonwealth Entities assigned all rights, title, and interest in, to or upon the Debentures to TSB via an Assignment of Debentures and Warrants dated December 28, 2007 (the "Assignment").

8.     A true, correct, complete and authentic copy of the Assignment is attached hereto as Exhibit A, and is incorporated herein by reference as if copied herein *in extenso*.

9.     The Assignment was made for value because TSB paid the Commonwealth Entities $4 million for their rights, title and interest in, to or upon the Debentures.

10.    Within the Assignment, Thinkstream, Incorporated of Colorado intervened, acknowledged and consented to the assignment of rights to the Debentures.

11.    Further, upon information and belief, Thinkstream, Incorporated of Colorado was allegedly merged into the debtor, Thinkstream Incorporated of Delaware, by an act of merger dated on or about April 4, 2012.

12.    Upon information and belief, the surviving entity was allegedly the debtor, Thinkstream Incorporated of Delaware.

13.    This alleged merger was not contemporaneously disclosed to TSB, and thus TSB reserves all rights, claims and defenses with respect to the alleged merger.

14.    By virtue of the Assignment, TSB is the holder and owner of the Debentures, and any obligations owed thereunder and under the Debenture Purchase Agreement by Thinkstream Incorporated of Delaware are owed to TSB.

15.     The Debentures were not assigned from the Commonwealth Entities to TSB for the purpose of commencing the above-captioned bankruptcy case.

16.     As of September 16, 2014, TSB's records show that Thinkstream Incorporated of Delaware owes TSB the aggregate sum of $8,939,107, representing $6,858,678 in unpaid principal and $2,080,429 in accrued, unpaid interest in connection with the Debentures and two promissory notes.

FURTHER AFFIANT SAYETH NOT.

                              **TSB VENTURES, LLC**


                              By: Jose S. Canseco
                              Its: Manager


Sworn to and subscribed before me
this 18th day of September 2014.


Ryan J. Richmond, Notary Public
Bar No. 30688, Notary No. 85886
My Commission is for Life

3

## ASSIGNMENT OF DEBENTURES AND WARRANTS

This Assignment of Debentures and Warrants (the "*Assignment*") is made effective as of the 28th day of December, 2007, and is entered into by and among TSB Ventures, LLC, a Louisiana limited liability company with its principal place of business in Louisiana (hereinafter referred to as the "*Purchaser*"), CA High Yield Fund, Ltd., CA High Yield Fund, LLC, and CA Core Fixed Income Fund, LLC (the three Funds collectively referred to herein as "*Sellers*"), Commonwealth Advisors Inc., a Delaware corporation with its principal place of business in Louisiana, acting on behalf of Sellers (referred to herein as "*Advisor*"), Thinkstream, Incorporated and Thinkstream Governmental, Inc. (Thinkstream, Incorporated and Thinkstream Governmental, Inc. are referred to herein as the "*Corporations*").

WHEREAS, Sellers are the holders of:

**Thinkstream, Incorporated 5% Debentures Due October 15, 2010 (CUISP 884100 AA 6) and**

**Warrant To Purchase 1,200,000 Shares Of Thinkstream, Incorporated @ $0.01 Per Shares And 1,200,000 Shares of Thinkstream Governmental, Inc. @ 0.01 Per Share (CUSIP 884100116);**

The debentures and warrants referenced above are referred herein as the "*Securities*," copies of which are attached hereto as Exhibit A; and

WHEREAS, Sellers wish to assign to Purchaser the Securities and Sellers' rights under that certain Debenture Purchase Agreement entered into as of the 23rd day of August 2005 among the Corporations and Advisor (the "*Debenture Purchase Agreement*") and Purchaser wishes to purchase the Securities and assume the Sellers' rights and obligations under the Debenture Purchase Agreement under the terms and conditions set forth in this Assignment.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## 1. Purchase Price

The consideration for the sale of the Securities by Sellers to Purchaser has been agreed to by Sellers and Purchaser (the "*Purchase Price*") and shall be paid in cash by Seller to Advisor for the benefit of Sellers upon the execution hereof.

## 2. Authority

Advisor represents to Purchaser and Corporations that it has the authority to act on behalf of Sellers to execute this Assignment and to sell the Securities. Purchaser represents and



EXHIBIT
A

warrants to Sellers and Advisor that it has authority to enter into this Assignment and to purchase the Securities.

### 3. Agreement of Purchaser to be Bound by Debenture Purchase Agreement

In accordance with the Section 8.1(a)(ii) of that certain Debenture Purchase Agreement entered into as of the 23rd day of September 2005 among the Corporations and Advisor (attached hereto as Exhibit B), Purchaser agrees to be bound by the terms of the Debenture Purchase Agreement.

### 4. Purchaser Representations and Warranties

The Purchaser represents and warrants to Sellers, Advisor, and Corporations as follows:

- Purchaser is acquiring the Securities for its own account and not with the view to, or for resale in connection with, any distribution thereof in violation of the Securities Act.

- Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

- Purchaser understands that the Securities are not registered under the Securities Act and corresponding state law and are restricted securities. Purchaser understands that the Securities are not freely transferable and it must bear the economic risk of this investment indefinitely subject to certain registration rights contained in the Debenture Purchase Agreement. Purchaser understands that Corporation has no present intention of filing with the U.S. Securities and Exchange Commission or with any state securities administrator any registration statement in respect of resale of the Securities in the United States. Purchaser acknowledges that any certificate representing the Securities will bear a legend indicating that the resale of such Securities is restricted.

- Purchaser is not aware of any general solicitation or advertising related to the offer or sale of the Securities. Purchaser has not received or been provided with, nor has it requested, nor does it have any need to receive, any offering memorandum or prospectus, describing or purporting to describe the Corporation or the Securities.

- Purchaser's tax identification number is 20-8906102

### 5. Consent to Assignment

Corporations do hereby agree that the provisions of Section 8.1(a)(ii) of the Debenture Purchase Agreement have been fulfilled, that it/they are satisfied that Purchaser is an "accredited investor" within the meaning of Regulation D of the Securities Act and that the Securities are not required to be registered under the Securities Act, and therefore, Corporations, both individually and collectively, do hereby consent to the transfer of the Securities and the assignment of all rights of Sellers under the Debenture Purchase Agreement (including all Registration Rights)

from Sellers to Purchaser and waive any requirement for an opinion of counsel that the assignment of the Securities will not require registration under the Securities Act.

**6. Assignment of Rights and Securities**

Sellers do hereby transfer and assign all of their right, title, and interest in the Securities and all of their rights under the Debenture Purchase Agreement to Purchaser for the Purchase Price tendered by Purchaser to Advisor for the benefit of Sellers. The assignment is made without any warranty or recourse. Sellers shall take all actions reasonably necessary to document such assignment, including endorsements, physical transfer of the Securities, and/or transfer from third-party custodians, if necessary.

**7. Confidentiality**

Purchaser and Corporations shall keep the information provided in this Assignment confidential and shall not use this information, for any purpose whatsoever other than in connection with the sale of the Securities.

**8. Miscellaneous.**

**Notices.** All notices, requests, demands and other communications under this Assignment shall be in writing and shall be deemed to have been duly "given" on the date of delivery, if delivery is made personally or by telegram or telecopy to the party to whom notice is to be given, or upon receipt if mailed by first class mail, either registered or certified, postage prepaid and properly addressed, as follows:

If to Purchaser:

> **TSB Ventures, LLC**
> 700 O'Keefe Avenue
> New Orleans, LA 70113
> Tel: 504-432-8096

If to the Sellers or Advisor:

> **Commonwealth Advisors, Inc.**
> 315 Third Street
> Baton Rouge, LA 70801
> Tel: 225-343-9342

If to the Corporations:

> **Thinkstream Incorporated**
> 6146 Crestmount
> Baton Rouge, LA 70809
> Tel: 225-291-5440

Each party may change its address for purposes of this Section by giving the other parties written notice of the new address in the manner set forth above.

## 9. Releases

**Release of Advisor and Sellers.** Corporations, both individually and collectively, on behalf of themselves, its/their respective parent companies, subsidiaries, affiliates, successors, predecessors, related entities, divisions, and their respective current and former representatives, agents, shareholders, officers, directors, attorneys, employees hereby release and forever discharge Sellers and Advisor and its/their respective parent companies, subsidiaries, affiliates, successors, predecessors, related entities, divisions, and their respective current and former representatives, agents, shareholders, members, partners, limited partners, officers, directors, managers, attorneys, and employees (collectively, the *"Commonwealth Releasees"*) from any and all claims, liens, rights, demands, actions, causes of action, suits, complaints, charges, grievances, damages, liabilities, debts, loss of money, accounts, reckonings, bonds, executions, demands and all other claims of any kind whatsoever, at law or in equity, whether known or unknown, suspected or unsuspected, contingent or absolute, disclosed or undisclosed, asserted or unasserted, hidden or concealed, matured or unmatured, material or immaterial that Corporations each ever had, now has/have or hereafter can, shall or may have against the Commonwealth Releasees, for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Assignment.

**Release of Corporations.** Sellers and Advisor, both individually and collectively, on behalf of themselves, its/their respective parent companies, subsidiaries, affiliates, successors, predecessors, related entities, divisions, and their respective current and former representatives, agents, shareholders, officers, directors, members, managers, partners, limited partners, attorneys, and employees hereby release and forever discharge Corporations and its/their respective parent companies, subsidiaries, affiliates, successors, predecessors, related entities, divisions, and their respective current and former representatives, agents, shareholders, officers, directors, attorneys, and employees (collectively, the *"Thinkstream Releasees"*) from any and all claims, liens, rights, demands, actions, causes of action, suits, complaints, charges, grievances, damages, liabilities, debts, loss of money, accounts, reckonings, bonds, executions, demands and all other claims of any kind whatsoever, at law or in equity, whether known or unknown, suspected or unsuspected, contingent or absolute, disclosed or undisclosed, asserted or unasserted, hidden or concealed, matured or unmatured, material or immaterial that Sellers and Advisor each ever had, now has/have or hereafter can, shall or may have against the Thinkstream Releasees, for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Assignment, **save and except** any obligations contained within or arising under either the Securities, the Debenture Purchase Agreement, or that certain promissory note dated February 8, 2007 by and between Thinkstream, Incorporated and Commonwealth Advisors, Inc. in the principal amount of $400,000.00, and further excepting from this release any rights of subrogation arising from the pledge of security to secure that certain loan by Bancorp South to Thinkstream, Incorporated in the principal amount of $1,000,000.00 dated October, 2006.

- 4 -

10.   <u>Comprehension of Document and No Reliance.</u>   ALL PARTIES TO THIS ASSIGNMENT HEREBY ACKNOWLEDGE THAT THEY HAVE HAD AN OPPORTUNITY TO CONSULT WITH INDEPENDENT LEGAL COUNSEL AND OTHER ADVISORS REGARDING ALL LEGAL, TAX, AND OTHER EFFECTS OF THIS ASSIGNMENT. EACH PARTY IS RELYING SOLELY ON ITS OWN BEST JUDGMENT AND IS NOT RELYING ON ANY REPRESENTATION OR STATEMENT, EXPRESS OR IMPLIED, BY ANY OTHER PARTY TO THIS ASSIGNMENT OR THAT OF ANY OF OTHER PARTIES' RESPECTIVE OFFICERS, SHAREHOLDERS, MEMBERS, AGENTS, EMPLOYEES, ATTORNEYS OR OTHER REPRESENTATIVES, UNLESS SUCH REPRESENTATION OR STATEMENT IS EXPRESSED IN WRITING IN THIS ASSIGNMENT.   THIS ASSIGNMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN OR AMONG THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN OR AMONG THE PARTIES.

11.   <u>Future Knowledge.</u>   All Parties to this Assignment acknowledge that they may hereafter discover facts different from, or in addition to, those which they now know or believe to be true with respect to facts and circumstances giving rise to the Releases contained in this Assignment and agree that the Releases contained in this Assignment shall be and remain effective in all respects notwithstanding such different or additional facts regardless of when learned; provided, however, the Releases contained in this Assignment will not release or be effective with respect to any claim that arises after the Effective Date which is based on an event, occurrence or circumstance that occurs after the Effective Date.

12.   <u>Governing Law.</u> This Assignment and the Securities shall be governed by, and construed in accordance with, the internal laws of the State of Louisiana (without reference to any principles of conflicts of laws).

13.   <u>Counterparts.</u> This Assignment may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one Assignment.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed by their respective officers thereunto duly authorized as of the date first above written.

**Remainder of Page Intentionally Left Blank**

**Signatures on Following Page**

Accepted and Agreed to:

**THINKSTREAM, INCORPORATED**

Barry Bellue
President

**THINKSTREAM GOVERNMENTAL, INC.**

Barry Bellue
President

**TSB VENTURES, L.L.C.**

Louis M. Freeman, Jr.
Vice-President -- Development

**COMMONWEALTH ADVISORS, INC.**
For and on behalf of itself, CA High Yield
Fund, Ltd., CA High Yield Fund, LLC, and
CA Core Fixed Income Fund, LLC

Walter Morales
President

Accepted and Agreed to:

**THINKSTREAM, INCORPORATED**

_____
Barry Bellue
President

**THINKSTREAM GOVERNMENTAL, INC.**

_____
Barry Bellue
President

**TSB VENTURES, L.L.C.**

_____
Louis M. Freeman, Jr.
Vice-President -- Development

**COMMONWEALTH ADVISORS, INC.**
For and on behalf of itself, **CA High Yield
Fund, Ltd., CA High Yield Fund, LLC,** and
**CA Core Fixed Income Fund, LLC**

_____
Walter Morales
President

**Exhibit A**
**Copies of Securities**

These securities have not been registered under the Securities Act of 1933, as amended (the "Act"), or any applicable state securities laws, and may not be sold, offered for sale or transferred unless such sale or transfer is in accordance with the registration requirements of such Act and applicable laws or an exemption from the registration requirements of such Act and applicable laws is available with respect thereto.

## THINKSTREAM, INCORPORATED

## 5% DEBENTURE DUE OCTOBER 15, 2010

Certificate No.  127                                          **CUSIP: 884100 AA 6**

Amount:        _____

Holder:        _____

Tax ID         _____

Thinkstream, Incorporated, a Colorado corporation ("Issuer"), herein called the "Issuer," which term includes any successor corporation for value received hereby promises to pay to the above listed Holder or his or her registered assigns, the principal sum of _____ on October 15, 2010, at the office or agency of the Issuer maintained for that purpose in accordance with the terms of in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, and to pay interest, semi-annually on April 15 and October 15 of each year, commencing April 15, 2006, on said principal sum at said office or agency, in like coin or currency, at the rate per annum of 5%, from October 15 or April 15, as the case may be, next preceding the date of this Note to which interest has been paid or duly provided for.

Interest payable on the Note on any April 15 or October 15 will be paid to the person entitled thereto as it appears in the Note register at the close of business on the record date, which shall be the April 1 or October 1 (whether or not a Business Day) next preceding such April 15 or October 15.

Interest shall be payable at the office of the Issuer maintained by the Issuer for such purposes in the Parish of East Baton Rouge, Louisiana, be paid either (i) by check mailed to the address of the Person entitled thereto as it appears in the Note register or (ii) by transfer to an account maintained by such Person located in the United States; provided, however, that payments to the Depositary will be made by wire transfer of immediately available funds to the account of the Depositary or its nominee.

Reference is made to the further provisions of this Note set forth on the reverse hereof, including, without limitation, provisions subordinating the payment of principal of and premium, if any, and interest on the Notes to the prior payment in full of all Senior Indebtedness, as defined in the Debenture Purchase Agreement. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Note shall be deemed to be a contract made under the laws of the State of Louisiana, and for all purposes shall be construed in accordance with and governed by the laws of the State of Louisiana, without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

THINKSTREAM, INCORPORATED                                    Attest:


By: _____                              _____
    Barry L. Bellue
    President

593999_2.DOC

**THINKSTREAM, INCORPORATED**

**5% DEBENTURE DUE OCTOBER 15, 2010**

This Note is one of a duly authorized issue of Notes of the Issuer, designated as its 5% Debenture due October 15, 2010 (herein called the "Notes"), limited to the aggregate principal amount of $4,000,000. Interest on the Notes shall be computed on the basis of a 360-day year of twelve 30-day months.

The Notes are issuable, without coupons, in denominations of $1,000 principal amount and any integral multiple of $1,000. Notes may be exchanged for a like aggregate principal amount of Notes of any other authorized denominations.

No recourse for the payment of the principal of or any premium or interest on this Note, or for any claim based hereon or otherwise in respect hereof, and no recourse under or upon any obligation, covenant or agreement of the Issuer in any Note, or because of the creation of any indebtedness represented thereby, shall be had against any incorporator, stockholder, employee, agent, officer or director or subsidiary, as such, past, present or future, of the Issuer or of any successor corporation, either directly or through the Issuer or any successor corporation, whether by virtue of any constitution, statute or rule of law or by the enforcement of any assessment or penalty or otherwise, all such liability being, by acceptance hereof and as part of the consideration for the issue hereof, expressly waived and released.

This Note shall be deemed to be a contract made under the laws of Louisiana, and for all purposes shall be construed in accordance with the laws of Louisiana, without regard to principles of conflicts of laws.

These securities have not been registered under the Securities Act of 1933, as amended (the "Act"), or any applicable state securities laws, and may not be sold, offered for sale or transferred unless such sale or transfer is in accordance with the registration requirements of such Act and applicable laws or an exemption from the registration requirements of such Act and applicable laws is available with respect thereto.

### WARRANT TO PURCHASE
### SHARES OF COMMON STOCK OF
### THINKSTREAM, INCORPORATED AND
### THINKSTREAM GOVERNMENTAL, INC.

Warrant No:    114                                                                CUSIP: 884100 11 6
Holder:        _____
Tax ID         _____

_____ Shares, Thinkstream, Incorporated @ $0.01 Per Share
_____ Shares, Thinkstream Governmental, Inc. @ $0.01 Per Share

1. **Issuance.** This Warrant is issued to Holder listed above by Thinkstream, Incorporated and Thinkstream Governmental, Inc. (hereinafter with their successors called collectively, the "Companies").

2. **Purchase Price; Number of Shares.** The registered holder of this Warrant (the "Holder"), commencing on the date hereof, is entitled upon surrender of this Warrant with the subscription form annexed hereto as Exhibit A duly executed, at the principal office of the Company, to purchase from each of the Companies 1,200,000 fully paid and nonassessable shares of common stock (par value $0,001) of each of the Companies (the "Shares") at a price per share (the "Purchase Price") of $.01 per share. The person or persons in whose name or names any certificate representing Shares of common stock is issued hereunder shall be deemed to have become the holder of record of the Shares represented thereby as at the close of business on the date this Warrant is exercised, whether or not the transfer books of the Companies shall be closed.

3. **Payment of Purchase Price.** The Purchase Price may be paid (i) in cash or by certified check or wire transfer, (ii) by the surrender or forgiveness by the Holder to the Companies of any promissory notes or other obligations issued by the Companies, with all such notes and obligations so surrendered being credited against the Purchase Price in an amount equal to the principal amount thereof plus accrued interest to the date of surrender, or (iii) by any combination of the foregoing.

4. **Fractional Shares.** No fractional shares shall be issued upon exercise of this Warrant. The Companies shall, in lieu of issuing any fractional share, pay the Holder entitled to such fraction a sum in cash equal to such fraction multiplied by the then effective Purchase Price.

5. **Exercise; Expiration Date; Automatic Exercise.** This Warrant may be exercised in whole or in part at any time commencing on the date hereof and ending at 5:00 p.m. Central Time on the fifth anniversary of the date of this Warrant (the "Expiration Date") and shall be void thereafter.

6. **Reserved Shares; Valid Issuance.** The Companies covenant that it will at all times from and after the date hereof reserve and keep available such number of its authorized shares of common stock of the Companies, free from all preemptive or similar rights therein, as will be sufficient to permit the exercise of this Warrant in full. The Companies further covenant that such Shares as may be issued pursuant to such exercise will, upon issuance, be duly and validly issued, fully paid and nonassessable and free from all taxes, liens and charges with respect to the issuance thereof.

7. **Share Splits and Dividends.** If after the date hereof the Companies shall subdivide the common stock, by share split or otherwise, or combine the common stock, or issue additional shares in payment of a share dividend on the common stock, the number of Shares of common stock issuable on the exercise of this Warrant shall forthwith be proportionately increased in the case of a subdivision or share dividend, or proportionately decreased in the case of a combination, and the Purchase Price shall forthwith be proportionately decreased in the case of a subdivision or share dividend, or proportionately increased in the case of a combination.

8. **Mergers and Reclassifications.** If after the date hereof the Companies shall enter into any Reorganization (as hereinafter defined), then, as a condition of such Reorganization, lawful provisions shall be made, and duly executed documents evidencing the same from the Companies or their successor shall be delivered to the Holder, so that the Holder shall thereafter have the right to purchase, at a total price not to exceed that payable upon the exercise of this Warrant in full, the kind and amount of shares of stock and other securities and property receivable upon such Reorganization by a holder of the number of shares of common stock which might have been purchased by the Holder immediately prior to such Reorganization, and in any such case appropriate provisions shall be made with respect to the rights and interest of the Holder to the end that the provisions hereof (including, without limitation, provisions for the adjustment of the Purchase Price and the number of Shares issuable hereunder) shall thereafter be applicable in relation to any shares of common stock or other securities and property thereafter deliverable upon exercise hereof. For the purposes of this Section 8, the term "Reorganization" shall include without limitation any reclassification, capital reorganization or change of the common stock (other than as a result of a subdivision, combination or share dividend provided for in Section 7 hereof), or any consolidation of the Companies with, or merger of the Companies into, another corporation or other business organization (other than a merger in which the Companies is the surviving entity and which does not result in any reclassification or change of the outstanding common stock), or any sale or conveyance to another corporation or other business organization of all or substantially all of the assets of the Companies.

9. **Certain Events.** If any change in the outstanding common stock of the Companies or any other event occurs as to which the provisions of Section 7 or Section 8 are not strictly applicable or if strictly applicable would not fairly protect the purchase rights of the Holder of the Warrant in accordance with such provisions, then the Board of Directors of the Companies shall make an adjustment in the number and class of shares available under the Warrant, the Purchase Price or the application of such provisions, so as to protect such purchase rights as aforesaid. The adjustment shall be such as will give the Holder

of the Warrant, upon exercise for the same aggregate Purchase Price, the total number, class and kind of shares as he would have owned had the Warrant been exercised prior to the event and had he continued to hold such shares until after the event requiring adjustment.

10. Certificate of Adjustment. Whenever the Purchase Price is adjusted, as herein provided, the Companies shall promptly deliver to the Holder a certificate of the Company's chief financial officer setting forth the Purchase Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment.

11. Issue Tax. The issuance of certificates for the Shares upon the exercise of the Warrant shall be made without charge to the Holder of the Warrant for any issue tax (other than any applicable income taxes) in respect thereof; provided, however, that the Companies shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than that of the then Holder of the Warrant being exercised.

12. Notices of Record Date, Etc. In the event of:

(a)   Any taking by the Companies of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, or any right to subscribe for, purchase, sell or otherwise acquire or dispose of any shares of common stock of any class or any other securities or property, or to receive any other right;

(b)   Any reclassification of the shares of common stock of the Companies, capital reorganization of the Companies, consolidation or merger involving the Companies, or sale or conveyance of all or substantially all of its assets;

(c)   Any voluntary or involuntary dissolution, liquidation or winding-up of the Companies; or

(d)   The filing of a registration statement under the Securities Act of 1933, as amended, in connection with an Initial Public Offering;

then and in each such event the Companies will provide or cause to be provided to the Holder a written notice thereof. Such notice shall be provided at least fifteen (15) business days prior to the date specified in such notice on which any such action is to be taken.

13. Representations, Warranties and Covenants. This Warrant is issued and delivered by the Companies and accepted by each Holder on the basis of the following representations, warranties and covenants made by the Companies:

(a) The Companies have all necessary authority to issue, execute and deliver this Warrant and to perform its obligations hereunder. This Warrant has been duly authorized, issued, executed and delivered by the Companies and is the valid and binding obligation of the Companies, enforceable in accordance with its terms.

(b) The Shares of common stock issuable upon the exercise of this Warrant have been duly authorized and reserved for issuance by the Companies and, when issued in accordance with the terms hereof, will be validly issued, fully paid and nonassessable.

(c) The issuance, execution and delivery of this Warrant do not, and the issuance of the Shares upon the exercise of this Warrant in accordance with the terms hereof will not, (i) violate or contravene the Companies' articles of incorporation, bylaws, or any law, statute, regulation, rule, judgment or order applicable to the Companies, (ii) violate, contravene or result in a breach or default under any contract, agreement or instrument to which the Companies are a party or by which the Companies or any of their assets are bound or (iii) require the consent or approval of or the filing of any notice (other than, if any, post-issuance state securities laws filings) or registration with any person or entity.

14. No Voting or Dividend Rights; Limitation of Liability. Nothing contained in this Warrant shall be construed as conferring upon the Holder hereof the right to vote or to consent or to receive notice as a member of the Companies or any other matters or any rights whatsoever as a member of the Companies. No dividends or interest shall be payable or accrued in respect of this Warrant or the interest represented hereby or the Shares purchasable hereunder until, and only to the extent that, this Warrant shall have been exercised. No provisions hereof, in the absence of affirmative action by the Holder to purchase Shares, and no mere enumeration herein of the rights or privileges of the Holder hereof, shall give rise to any liability of such Holder for the Purchase Price or as a member of the Companies, whether such liability is asserted by the Companies or by their creditors.

15. Amendment. The terms of this Warrant may be amended, modified or waived only with the written consent of the Holder.

16. Notices, Etc.

(a) Any notice or written communication required or permitted to be given to the Holder may be given by United States mail, by overnight courier or by facsimile transmission at the address most recently provided by the Holder to the Companies or by hand, and shall be deemed received upon the earlier to occur of (i) receipt, (ii) if sent by overnight courier, then on the day after which the same has been delivered to such courier for overnight delivery, or (iii) if sent by United States mail, seventy-two (72) hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail.

(b) In case this Warrant shall be mutilated, lost, stolen or destroyed, the Companies shall issue a new Warrant of like tenor and denomination and deliver the same (i) in exchange and substitution for and upon surrender and cancellation of any mutilated Warrant, or (ii) in lieu of any Warrant lost, stolen or destroyed, upon receipt of an affidavit of the Holder or other evidence reasonably satisfactory to the Companies of the loss, theft or destruction of such Warrant.

17. Transfer. This Warrant and all rights hereunder are transferable in whole or in part by the Warrantholder and any successor transferee upon the prior written consent of the Companies (which such consent shall not be unreasonably withheld), provided that Warrantholder may, without the consent of the Companies, transfer this Warrant Agreement to any direct, or indirect, wholly-owned subsidiary of Warrantholder. The transfer shall be recorded on the books of the Companies upon receipt by the Companies of a notice of transfer in the form attached hereto as Exhibit C (the "Transfer Notice"), at its principal offices and the payment to the Companies of all transfer taxes and other governmental charges imposed on such transfer. No transfer of this Warrant Agreement, any shares of Common Stock issuable upon exercise hereof shall be effective unless the Companies shall first receive from such proposed transferee a written agreement, satisfactory to the Companies, providing that such transferee is subject to all of the terms and conditions hereof.

18. No Impairment. The Companies will not, by amendment of its articles of organization or through any reclassification, capital reorganization, consolidation, merger, sale or conveyance of assets, dissolution, liquidation, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance of performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder.

19. **Descriptive Headings and Governing Law.** The descriptive headings of the several sections and paragraphs of this Warrant are inserted for convenience only and do not constitute a part of this Warrant. The provisions and terms of this Warrant shall be governed by and construed in accordance with the internal laws of the State of Louisiana.

20. **Successors and Assigns.** This Warrant shall be binding upon the Companies' successors and assigns and shall inure to the benefit of the Holder's successors and legal representatives.

Dated_____, 2006

THINKSTREAM, INCORPORATED

By:  _____

Name:    Barry L. Bellue

Title:    President and Chief Executive Officer

Dated_____, 2006

THINKSTREAM GOVERNMENTAL, INC.

By:  _____

Name:    Barry L. Bellue

Title:    President and Chief Executive Officer

**Exhibit B**
**Debenture Purchase Agreement**

EXHIBIT C

## SCHEDULE B

## THINKSTREAM, INCORPORATED

## DEBENTURE PURCHASE AGREEMENT

This Debenture Purchase Agreement (this "Agreement") is entered into as of this ___ day of August 2005, among Thinkstream, Incorporated, a Colorado corporation (the "Company"), and Thinkstream Governmental, Inc., a Delaware corporation ("Thinkstream Governmental"), joining for purposes of issuing warrants, and Commonwealth Advisors, Inc., a Louisiana corporation, on behalf of itself and its clients ("Creditor").

**1. Purchase and Sale of Debentures.**

**1.1   Authorization.** Pursuant to this Agreement, the Company has authorized the issuance of Debentures in the form attached hereto as Exhibit A (each individually, a "Debenture" and collectively, the "Debentures"), and the Company and Thinkstream Governmental have authorized the warrants more specifically described in Section 5.3 hereof (collectively, the "Warrants").

**1.2   Issuance and Sale of Securities.** Subject to the terms and conditions hereof, the Company hereby agrees to issue and sell to Creditor, and Creditor hereby agrees to accept delivery from the Company of, a Debenture and the Warrants to be issued to such Creditor pursuant to Section 5.3 hereof. Each Creditor will receive warrants to purchase 300 shares of common stock of Thinkstream, Incorporated and 300 shares of common stock of Thinkstream Governmental, Inc. at a price of $0.01 per share for each $1,000 in Debentures purchased.

**1.3   Advance of Funds.** At the Closing, the Company shall deliver to each Creditor the Initial Warrant and a Debenture against delivery to the Company by the Creditors, severally but not jointly, of advances by wire transfer of immediately available funds, or by check, in the aggregate amount outstanding at any one time under all of the Debentures of four million and no/100 dollars ($4,000,000), subject to the conditions set forth herein and in the Debentures.

**1.4   Repayment Terms/Conversion.** Outstanding principal and accrued interest on the Debentures shall be fully due and payable in compliance with the terms set forth in the Debentures and the Indenture.

**2. Security/Subordination.**

**2.1   Security.**      The Debentures shall be unsecured.

**2.2   Rank.** Company and Creditor agree that the Debentures shall be senior obligations with the exception that the Debentures will rank junior to any current or future secured receivables financing (the "Senior Indebtedness"). In all other cases, the Company agrees to obtain a written subordination agreement from any lender or creditor for any current or future funded debt in a form that is acceptable to Creditor and which provides for such other party or creditor to fully subordinate its rights and interests in favor of Creditor.

3. **Representations and Warranties of the Company.**

The Company hereby represents and warrants the following as of the date hereof, as of the date of Closing, and as of the date of each subsequent borrowing:

   3.1   **Organization and Standing.** The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Colorado and has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify is reasonably likely to have a material adverse effect on its business or its properties.

   3.2   **Authorization.** All action on the part of the Company, its officers and directors necessary for the authorization, execution and delivery of this Agreement, the Debentures, the Warrants, and performance of all obligations of the Company hereunder and thereunder, has been or shall be taken prior to the Closing, and this Agreement, the Debentures, and the Warrants, when executed and delivered, shall constitute the valid and legally binding obligations of the Company, enforceable in accordance with their terms.

   3.3.   **Consents.** No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with any third party or any federal, state or provincial governmental authority on the part of the Company is required in connection with the consummation of the transactions contemplated herein, other than consents related to interest rates which may be deemed to exceed the maximum interest rates established by the law.

   3.4   **No Conflicts.** Neither the execution and delivery of this Agreement, the Debentures, or the Warrants by the Company nor the consummation by the Company of the transactions contemplated herein will (i) conflict with or result in any breach of any provision of the Articles of Incorporation or Bylaws of the Company, (ii) violate in any material respect any statute, rule, regulation, order, writ, injunction, decree or arbitration award applicable to the Company or its assets, or (iii) breach in any material respect any other material agreement, undertaking, contract, or security agreement to which the Company is subject.

   3.5   **No Defaults.** No Event of Default, as defined in Section 7.1 of this Agreement, shall have occurred and be continuing prior to the Closing or any subsequent advance.

   3.6   **Voting.** Other than the shares of common stock, there are no shares in the Company possessing voting rights.

   3.7   **Authorized Shares.** Until the later of the date on which (a) all the Warrants have been exercised or have expired, or (b) the Maturity Date (as defined in the Debentures), the Company shall maintain sufficient numbers of shares of common stock to permit the full exercise of the Warrants.

   3.8   **Paying Agent and Registrar.** Company shall have executed a Paying Agent and Registrar Agreement for the Debentures.

2

**4. Representations and Warranties of Creditor.**

Creditor, on behalf of itself and its clients, represents and warrants to the Company as follows:

**4.1   Authorization.** This Agreement, when executed and delivered by it, will constitute a valid and legally binding obligation of it, enforceable in accordance with its terms.

**4.2   Accredited Investor.** Creditor and its clients set forth in Exhibit C are accredited investors as defined by the Securities Act of 1933, as amended (the "Securities Act") and the regulations promulgated thereunder.

**4.3   Investment.** Creditor is acquiring the Debenture to be sold by the Company to it, the Warrants to be issued by the Company and Thinkstream Governmental to it, and any equity in the Company or Thinkstream Governmental which it may receive therefrom for investment for its own account or for clients of Creditor and not with the view to, or for resale in connection with, any distribution thereof in violation of the Securities Act.

It understands that the Debenture to be sold by the Company to it, the Warrants to be issued by the Company and Thinkstream Governmental to it, and equity of the Company or Thinkstream Governmental to be purchased or received have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act, which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Creditor's representations as expressed herein. It has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company so that it is capable of evaluating the merits and risks of its investment in the Company and has the capacity to protect its own interests. It must bear the economic risk of this investment indefinitely unless the Debentures, Warrants or shares to be issued to it pursuant to the Warrants are registered pursuant to the Securities Act, or an exemption from registration is available.

**4.4   Investigation.** Creditor has both the knowledge and experience in financial matters sufficient to evaluate the purchase of the Debentures and the Warrants and Creditor and its clients are able to bear the economic risk of the purchase. Creditor has made an independent investigation and analysis of the Company and Thinkstream Governmental, the Debentures, and the Warrants a for the purpose of acquiring the Debentures and Warrants. Creditor has had reasonable and sufficient access to such documents and other information and materials, as Creditor considers appropriate to make my necessary evaluation.

**4.5   High Risk.** Creditor acknowledges that the purchase of the Debentures and Warrants involves a high degree of risk of loss.

**5. Conditions of Creditors' Obligations at Closing.**

The obligations of the Creditors under Sections 1.2 and 1.3 of this Agreement are subject to the fulfillment on or before the Closing, and on or before each borrowing, of each of the following conditions:

3

5.1     **Representations and Warranties.** The representations and warranties of the Company contained in Section 3 hereof shall be true on and as of the Closing and each borrowing.

5.2     **Performance/No Event of Default.** The Company shall have performed and complied with all agreements and conditions contained herein to be performed or complied with by it on or before the Closing and there shall exist no Event of Default.

5.3     **Execution and Delivery of Debenture and Warrant.** The Company shall have authorized, executed and delivered the appropriate number and denomination of (a) Debentures and (b) warrants to Creditor to purchase, on a pro rata basis, shares of the Company's common stock at an exercise price of $.01 per share (the "Initial Warrants") in a form substantially similar to that set forth at Exhibit B.

5.4     **Good Standing.** The Company shall have delivered a Certificate of Good Standing from the State of Colorado and State of Louisiana, dated no more than thirty (30) days prior to the Closing.

**6.   Conditions of the Company's Obligations at Closing.**

The obligations of the Company under Sections 1.2 and 1.3 of this Agreement are subject to the fulfillment on or before the Closing of the following condition:

6.1     **Representations and Warranties.** The representations and warranties of the Creditor contained in Section 4 hereof shall be true on and as of the Closing.

**7.   Default.**

7.1     **Events of Default.** With respect to the Debentures, the Warrants and this Agreement, the following events are "Events of Default" thereunder and hereunder:

(a) Default shall be made by the Company in the payment of principal of or any interest on any Debenture after five (5) days' written notice from the applicable Creditor following the date when the same is due and payable; or

(b) Default shall be made in the due performance or observance of any other material covenant, agreement or provision herein, or in any Debenture, or any Warrant, to be performed or observed by the Company, or a material breach shall exist in any representation or warranty herein contained, or in any Debenture, or any Warrant, as of the date when made, and such default or breach shall have continued for a period of thirty (30) days after written notice thereof to the Company from the applicable Creditor; or

(c) The Company shall be involved in financial difficulties as evidenced:

(i)     by the Company filing a petition in bankruptcy or for reorganization or for the adoption of an arrangement under the United States Bankruptcy Code (as now or in the future amended, the "Bankruptcy Code") or an admission seeking the relief therein provided;

4

(ii)  By the Company making a general assignment for the benefit of its creditors;

(iii)  By the Company consenting to the appointment of a receiver or trustee for all or a substantial part of the property of the Company or approving as filed in good faith a petition filed against the Company under said Bankruptcy Code (in both cases without the consent of the Company);

(iv)  By the commencement of a proceeding or case, without the application or consent of the Company, in any court of competent jurisdiction, seeking (i) its liquidation, reorganization, dissolution or winding-up, or the composition or readjustment of its debts; (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of the Company or of all or any substantial part of its assets, or (iii) similar relief in respect of the Company under any law relating to bankruptcy, insolvency, reorganization, winding-up or composition or adjustment of debts, and such proceeding or case set forth in (i), (ii), or (iii) above continues undismissed or uncontroverted, or an order, judgment or decree approving or ordering any of the foregoing being entered and continuing unstayed and in effect, for a period of sixty (60) days; or

(v)  By the Company admitting in writing its inability to pay its debts as such debts become due; or

(d)  Company shall be terminated, dissolved or liquidated (as a matter of law or otherwise) or proceedings shall be commenced by the Company or by any person seeking the termination, dissolution or liquidation of the Company.

**7.2  Acceleration.**  If any one or more Events of Default described in Section 7.1 shall occur and be continuing, then Creditor may declare the unpaid balance of the Debentures owing to be forthwith due and payable and thereupon such balance shall become so due and payable without presentation, protest or further demand or notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived by the Company.

**8.  Registration; Restrictions on Transfer.**

**8.1  Restrictions on Transfer.**

(a)  Creditor agrees not to make any disposition of all or any portion of the Debentures, Warrants, or shares of common stock issued upon exercise of the Warrants (collectively "Registrable Securities") unless and until:

(i)  There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(ii)  (A) The transferee has agreed in writing to be bound by the terms of this Agreement, (B) Creditor shall have notified the Company of the proposed disposition and

5

shall have furnished the Company with a reasonably detailed written statement of the circumstances surrounding the proposed disposition (such statement to include, without limitation, the name of the transferee, the number of shares to be transferred, the price per share and type of consideration to be received in the transfer and the timing of such transfer) and (C) if reasonably requested by the Company, such Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Securities Act. It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 except in unusual circumstances.

(iii) Notwithstanding the provisions of paragraphs (i) and (ii) above, no such registration statement or opinion of counsel shall be necessary for a transfer by a Holder (A) which is a partnership to its partners or former partners in accordance with partnership interests, (B) which is a corporation to its stockholders in accordance with their interest in the corporation, (C) which is a limited liability company to its members or former members in accordance with their interest in the limited liability company, or (D) to the Holder's family member or trust for the benefit of an individual Holder.

(b) Each certificate representing Registrable Securities shall (unless otherwise permitted by the provisions of the Agreement) be stamped or otherwise imprinted with a legend substantially similar to the following (in addition to any legend required under applicable state securities laws or as provided elsewhere in this Agreement):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

(c) The Company shall be obligated to reissue promptly unlegended certificates at the request of any Holder thereof if the Holder shall have obtained an opinion of counsel (which counsel may be counsel to the Company) reasonably acceptable to the Company to the effect that the securities proposed to be disposed of may lawfully be so disposed of without registration, qualification or legend.

(d) Any legend endorsed on an instrument pursuant to applicable state securities laws and the stop-transfer instructions with respect to such securities shall be removed upon receipt by the Company of an order of the appropriate blue sky authority authorizing such removal.

**8.2    Demand Registration.**

(a)  Subject to the conditions of this Section 8.2, if the Company shall receive a written request from Creditor that the Company file a registration statement under the Securities Act covering the registration of Registrable Securities having an anticipated aggregate offering price to the public of at least $10,000,000 (a "Qualified Public Offering"), then the Company shall, within thirty (30) days of the receipt thereof, give written notice of such request to Creditor, and subject to the limitations of this Section 8.2, use its best efforts to effect, as soon as practicable, the registration under the Securities Act of all Registrable Securities that the Holders request to be registered.

(b)  If the Creditor intends to distribute the Registrable Securities covered by its request by means of an underwriting, it shall so advise the Company as a part of its request made pursuant to this Section 8.2 and the Company shall include such information in the written notice referred to in Section 8.2(a).  In such event, the right of any Holder to include its Registrable Securities in such registration shall be conditioned upon Creditor's participation in such underwriting and the inclusion of Creditor's Registrable Securities in the underwriting (unless otherwise mutually agreed.  Creditor shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by Creditor (which underwriter or underwriters shall be reasonably acceptable to the Company). If Creditor does not agree to the terms of any such underwriting, Creditor shall be excluded therefrom by written notice from the Company or the underwriter. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall also be withdrawn from such registration. Notwithstanding any other provision of this Section 8.2, if the underwriter advises the Company that marketing factors require a limitation of the number of securities to be underwritten (including Registrable Securities) then the Company shall so advise Creditor and the number of shares that may be included in the underwriting shall be allocated to the Holders of such Registrable Securities on a pro rata basis based on the number of Registrable Securities held by all Creditors (including the Initiating Holders).  Any Registrable Securities excluded or withdrawn from such underwriting shall be withdrawn from the registration.

(c)  The Company shall not be required to effect a registration pursuant to this Section 8.2:

(i)  prior to the earlier of September 15, 2007 or 180 days after the effective date of a registration statement pertaining to the Initial Offering; and

(ii) after the Company has effected two (2) registrations pursuant to this Section 8.2, and such registrations have been declared or ordered effective.

**8.3  Piggyback Registrations.** The Company shall notify Creditor in writing at least thirty (30) days prior to the filing of any registration statement under the Securities Act for purposes of a public offering of securities of the Company (including, but not limited to, registration statements relating to secondary offerings of securities of the Company, but excluding registration statements relating to employee benefit plans or with respect to corporate reorganizations or other transactions under Rule 145 of the Securities Act) and will afford Creditor an opportunity to include in such registration statement all or part of such Registrable

7

Securities held by Creditor. Within fifteen (15) days after the above-described notice from the Company, Creditor shall notify the Company in writing. Such notice shall state the intended method of disposition of the Registrable Securities by Creditor. If Creditor decides not to include all of its Registrable Securities in any registration statement thereafter filed by the Company, Creditor shall nevertheless continue to have the right to include any Registrable Securities in any subsequent registration statement or registration statements as may be filed by the Company with respect to offerings of its securities, all upon the terms and conditions set forth herein.

(a) Underwriting. If the registration statement under which the Company gives notice under this Section 8.3 is for an underwritten offering, the Company shall so advise the Holders of Registrable Securities in the above-described notice. In such event, the right of any Creditor to be included in a registration pursuant to this Section 8.3 shall be conditioned upon Creditor's participation in such underwriting and the inclusion of Creditor's Registrable Securities in the underwriting to the extent provided herein. Creditor shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company. Notwithstanding any other provision of the Agreement, if the underwriter determines in good faith that marketing factors require a limitation of the number of shares to be underwritten, the number of shares that may be included in the underwriting shall be allocated, first, to the Company; second, to Creditor on a pro rata basis based on the total number of Registrable Securities held by the Holders; and third, to any member of the Company (other than a Holder) on a pro rata basis. No such reduction shall (i) reduce the securities being offered by the Company for its own account to be included in the registration and underwriting, or (ii) reduce the amount of securities of the selling Holders included in the registration below thirty percent (30%) of the total amount of securities included in such registration, unless such offering is the Initial Offering and such registration does not include shares of any other selling members, in which event any or all of the Registrable Securities of the Holders may be excluded in accordance with the immediately preceding sentence.

(b) Right to Terminate Registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 8.3 prior to the effectiveness of such registration whether or not any Holder has elected to include securities in such registration. The Registration Expenses of such withdrawn registration shall be borne by the Company in accordance with Section 8.4 hereof.

8.4    **Expenses of Registration.** Except as specifically provided herein, all Registration Expenses incurred in connection with any registration, qualification or compliance pursuant to Section 8.2 or any registration under Section 8.3 herein shall be borne by the Company. All Selling Expenses incurred in connection with any registrations hereunder, shall be borne by the holders of the securities so registered pro rata on the basis of the number of shares so registered. The Company shall not, however, be required to pay for expenses of any registration proceeding begun pursuant to Section 8.2, the request of which has been subsequently withdrawn by the Initiating Holders unless (a) the withdrawal is based upon material adverse information concerning the Company of which Creditor was not aware at the time of such request or (b) the Holders of a majority of Registrable Securities agree to forfeit their right to one requested registration pursuant to Section 8.2, in which event such right shall be forfeited by all Holders. If the Holders are required to pay the Registration Expenses, such

8

expenses shall be borne by the holders of securities (including Registrable Securities) requesting such registration in proportion to the number of shares which were ultimately included in such registration. If the Company is required to pay the Registration Expenses of a withdrawn offering pursuant to clause (a) above, then the Holders shall not forfeit their rights pursuant to Section 8.2 to a demand registration.

8.5     **Obligations of the Company.** Whenever required to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a) Prepare and file with the SEC a registration statement with respect to such Registrable Securities and use all reasonable efforts to cause such registration statement to become effective, and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for up to ninety (90) days or, if earlier, until the Holder or Holders have completed the distribution related thereto.

(b) Prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(c) Furnish to the Holders such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them.

(d) Use all reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as shall be reasonably requested by the Holders, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.·

(e) In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter(s) of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(f) Notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

(g) Furnish, at the request of a majority in interest of the Holders participating in the registration, on the date that such Registrable Securities are delivered to the underwriters for sale, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated as of such date, of the counsel representing the Company

9

for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering and reasonably satisfactory to a majority in interest of the Holders requesting registration, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities and (ii) a letter dated as of such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering and reasonably satisfactory to a majority in interest of the Holders requesting registration, addressed to the underwriters, if any, and if permitted by applicable accounting standards, to the Holders requesting registration of Registrable Securities.

(h) Cause all such Registrable Securities registered pursuant hereto to be listed on each securities exchange or quoted on each quotation system on which similar securities issued by the Company are then listed or quoted.

(i) Provide a transfer agent and registrar for all Registrable Securities registered pursuant hereto and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration.

8.6    **Termination of Registration Rights.** All registration rights granted under this Section 8 shall terminate and be of no further force and effect five (5) years after the date of the Company's Initial Offering. In addition, a Holder's registration rights shall expire if (a) the Company has completed its Initial Offering and is subject to the provisions of the Exchange Act, and (b) all Registrable Securities held by and issuable to Creditor may be sold under Rule 144 during any ninety (90) day period. Following such expiration provided for in the preceding two sentences, Creditor's shares of common stock of the Company shall no longer be considered Registrable Securities for purposes of this Section 8.

8.7    **Delay of Registration; Furnishing Information.**

(a) No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 8.

(b) The Company shall not be required to submit any registration statement to the Commission pursuant to Section 8.2 or 8.3 if Creditor has not furnished to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be required to effect the registration of their Registrable Securities; provided, however, that the Company may eliminate the shares proposed to be sold by any selling Holder from registration pursuant to Section 8.2 or 8.3 if Creditor has not provided such information, to the reasonable satisfaction of the Company, within twenty (20) days of having received written notice of a request for such information from the Company.

(c) The Company shall have no obligation with respect to any registration requested pursuant to Section 8.2 if, due to the operation of subsection 8.2(b), the number of shares or the anticipated aggregate offering price of the Registrable Securities to be included in the registration does not equal or exceed the number of shares or the anticipated aggregate offering price required to originally trigger the Company's obligation to initiate such registration as

specified in Section 8.2. Where a registration requested pursuant to Section 8.2 is not completed because the number of shares or the anticipated aggregate offering price of the Registrable Securities to be included in the registration does not equal or exceed the number of shares or the anticipated aggregate offering price required to originally trigger the Company's obligation to initiate such registration, the request to initiate such registration shall not count against the number of requests permitted to be made pursuant to Section 8.2. Where a registration requested pursuant to Section 8.2 is completed even though the number of shares or the anticipated aggregate offering price of the Registrable Securities to be included in the registration is less than the number of shares or the anticipated aggregate offering price required to originally trigger the Company's obligation to initiate such registration, the request initiate such registration shall count against the number of requests permitted to be made pursuant to Section 8.2.

8.8     **Indemnification.** In the event any Registrable Securities are included in a registration statement under Sections 8.2 or 8.3 :

(a)  The Company will indemnify and hold harmless Creditor, the partners, officers, directors and legal counsel of Creditor, any underwriter (as defined in the Securities Act) for Creditor and each person, if any, who controls Creditor or underwriter within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages, or liabilities (joint or several) to which they may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations (collectively a "Violation") by the Company: (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law in connection with the offering covered by such registration statement; and the Company will reimburse each Creditor, partner, officer, director, legal counsel, underwriter or controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided however, that the indemnity agreement contained in this Section 8.8(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld, nor shall the Company be liable in any such case for any such loss, claim, damage, liability or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by Creditor, partner, officer, director, legal counsel, underwriter or controlling person of Creditor.

(b)  Creditor will, if Registrable Securities held by Creditor are included in the securities as to which such registration qualifications or compliance is being effected, indemnify and hold harmless the Company, each of its directors, its officers, and legal counsel and each person, if any, who controls the Company within the meaning of the Securities Act, any underwriter and any other Holder selling securities under such registration statement or any of such other

Holder's partners, directors or officers or any person who controls Creditor, against any losses, claims, damages or liabilities (joint or several) to which the Company or any such director, officer, controlling person, underwriter or other Creditor, or partner, director, officer or controlling person of such other Holder may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by Creditor under an instrument duly executed by Creditor and stated to be specifically for use in connection with such registration; and each Creditor will reimburse any legal or other expenses reasonably incurred by the Company or any such director, officer, legal counsel, controlling person, underwriter or other Holder, or partner, officer, director, legal counsel or controlling person of such other Holder in connection with investigating or defending any such loss, claim, damage, liability or action if it is judicially determined that there was such a Violation; provided, however, that the indemnity agreement contained in this Section 8.8(b) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; provided further, that in no event shall any indemnity under this Section 8.8 exceed the net proceeds from the offering received by Creditor.

(c) Promptly after receipt by an indemnified party under this Section 8.8 of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 8.8, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this Section 8.8, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 8.8.

(d) If the indemnification provided for in this Section 8.8 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any losses, claims, damages or liabilities referred to herein, the indemnifying party, in lieu of indemnifying such indemnified party thereunder, shall to the extent permitted by applicable law contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the Violation(s) that resulted in such loss, claim, damage or liability, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the

12

indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; provided, that in no event shall any contribution by a Holder hereunder exceed the net proceeds from the offering received by Creditor.

(e) The obligations of the Company and Holders under this Section 8.8 shall survive completion of any offering of Registrable Securities in a registration statement and the termination of this Agreement. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation.

**8.9    Assignment of Registration Rights.** The rights to cause the Company to register Registrable Securities pursuant to this Section 8 may be assigned by Creditor to a transferee or assignee of Registrable Securities which (a) (i) is a client who is an accredited investor for which Creditor holds discretionary authority over the account, or (ii) a subsidiary, parent, affiliate, general partner, limited partner or retired partner of a Holder. No assignment of Registrable Securities pursuant to this Section 8.9 shall be effective unless (A) the transferor shall, within ten (10) days after such transfer, furnish to the Company written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being assigned and (B) such transferee shall agree to be subject to all restrictions set forth in this Agreement.

**8.10    Rule 144 Reporting.** With a view to making available to the Holders the benefits of certain rules and regulations of the SEC that may permit the sale of the Registrable Securities to the public without registration, the Company agrees to use its best efforts to:

(a) Make and keep public information available, as those terms are understood and defined in SEC Rule 144 or any similar or analogous rule promulgated under the Securities Act, at all times after the effective date of the first registration filed by the Company for an offering of its securities to the general public;

(b) File with the SEC, in a timely manner, all reports and other documents required of the Company under the Exchange Act;

(c) So long as a Holder owns any Registrable Securities, furnish to Creditor forthwith upon request: a written statement by the Company as to its compliance with the reporting requirements of said Rule 144 of the Securities Act, and of the Exchange Act (at any time after it has become subject to such reporting requirements); a copy of the most recent annual or quarterly report of the Company; and such other reports and documents as a Holder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities without registration.

**9.  Basic Financial Information and Reporting.**

(a) The Company will maintain true books and records of account in which full and correct entries will be made of all its business transactions pursuant to a system of accounting

13

established and administered in accordance with generally accepted accounting principles consistently applied, and will set aside on its books all such proper accruals and reserves as shall be required under generally accepted accounting principles consistently applied.

(b) As soon as practicable after the end of each fiscal year of the Company, and in any event within ninety (90) days thereafter, the Company will furnish Creditor a balance sheet of the Company, as at the end of such fiscal year, and a statement of income and a statement of cash flows of the Company, for such year, all prepared in accordance with generally accepted accounting principles consistently applied and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail. Such financial statements shall be accompanied by a report and opinion thereon by independent public accountants of national standing selected by the Company's Board of Directors.

(c) The Company will furnish Creditor, as soon as practicable after the end of each quarter, and in any event within thirty (30) days thereafter, a balance sheet of the Company as of the end of each such quarter, and a statement of income and a statement of cash flows of the Company for such quarter and for the current fiscal year to date, prepared in accordance with generally accepted accounting principles consistently applied, with the exception that no notes need be attached to such statements and year-end audit adjustments may not have been made.

**10. DTC Provisions**

**10.1.** The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the securities (the "Securities"). The Securities will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Security certificate will be issued for the Securities, in the aggregate principal amount of such issue, and will be deposited with DTC.

**10.2.** DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instrument from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities

14

Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

10.3. Purchases of Securities under the DTC system must be made by or through Direct Participants, which will receive a credit for the Securities on DTC's records. The ownership interest of each actual purchaser of each Security ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Securities are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Securities, except in the event that use of the book-entry system for the Securities is discontinued.

10.4. To facilitate subsequent transfers, all Securities deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other name as may be requested by an authorized representative of DTC. The deposit of Securities with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Securities; DTC's records reflect only the identity of the Direct Participants to whose accounts such Securities are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

10.5. Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

10.6. Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to the Securities unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Securities are credited on the record date (identified in a listing attached to the Omnibus Proxy).

10.7. Redemption proceeds, distributions, and dividend payments on the Securities will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from Issuer or Agent on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to

Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, Paying Agent, or Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of Issuer or Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

**10.8.** DTC may discontinue providing its services as securities depository with respect to the Securities at any time by giving reasonable notice to Issuer or Agent. Under such circumstances, in the event that a successor securities depository is not obtained, Security certificates are required to be printed and delivered.

**10.9.** Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, Security certificates will be printed and delivered to DTC.

**10.10.** The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that Issuer believes to be reliable, but Issuer takes no responsibility for the accuracy thereof.

**11. Miscellaneous.**

**11.1   Notices.** All notices, requests, demands and other communications under this Agreement, the Debentures, and the Warrants shall be in writing and shall be deemed to have been duly "given" on the date of delivery, if delivery is made personally or by telegram or telecopy to the party to whom notice is to be given, or upon receipt if mailed by first class mail, either registered or certified, postage prepaid and properly addressed as follows:

If to the Company:

> Thinkstream, Incorporated
> 6146 Crestmount
> Baton Rouge, LA 70809
> Tel: 225-291-5440

If to Thinkstream Governmental:

> Thinkstream Governmental, Inc.
> 6146 Crestmount
> Baton Rouge, LA 70809
> Tel: 225-291-5440

If to the Creditor:

16

Commonwealth Advisors, Inc.
247 Florida St.
Baton Rouge, LA 70801
Tel: 225-343-9342

Each party may change its address for purposes of this Section by giving the other parties written notice of the new address in the manner set forth above.

**11.2   Remedies.** No failure on the part of any Creditor to exercise, and no delay on the part of the Trustee or any Creditor in exercising, any right hereunder or under the Debentures, or the Warrants shall operate as a waiver thereof; nor shall any single or partial exercise of any right owned by it preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**11.3   Costs and Expenses.** The Company shall pay all of the reasonable costs and expenses, including without limitation all reasonable attorneys' fees and legal expenses, incurred by it in connection with the documentation of this Agreement, the Debentures, the Warrants, the and other documents to be delivered hereunder.

**11.4   Binding Effect; Governing Law.** This Agreement, the Debentures, and the Warrants shall be binding upon and inure to the benefit of the Company and the Creditors and their respective successors. This Agreement, the Debentures, and the Warrants shall be governed by, and construed in accordance with, the internal laws of the State of Louisiana (without reference to any principles of conflicts of laws).

**11.5   Jurisdiction.** The Company and Creditors each hereby irrevocably submit to the non-exclusive jurisdiction of any court sitting in the Parish of East Baton Rouge over any action, suit or proceeding arising out of or relating to this Agreement, the Debentures, the Warrants, or the Investor Rights Agreement. The Company and the Creditors agree that final judgment in any such action, suit or proceeding brought in such a court shall be conclusive and binding upon the Company and the Creditors and may be enforced in any court of the jurisdiction to which the Company or the Creditors are subject by a suit upon such judgment; provided, however, that service of process is affected upon the Company or the Creditors in the manner permitted by law.

**11.6   Counterparts.** This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one Agreement.

**11.7   Term.** This Agreement shall terminate upon repayment or conversion of all of the Debentures.

17

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

Accepted and Agreed to:

Walter A. Morales
President
Commonwealth Advisors, Inc.

Barry L. Bellue
President
Thinkstream, Incorporated

Barry L. Bellue
President
Thinkstream Governmental, Inc.

18